THE STATE OF FLORIDA, ex rel., CARY D. LANDIS, Attorney General of said State, joined by H. B. PHILIPS, JOHN W. SWISHER, R. G. SKINNER, WILBUR W. MASTERS AND F. SPENCE PERRY, *Co-relators*, vs. DUVAL COUNTY, FLORIDA, *Respondent*.

141 So. 173

En Banc.

Opinion filed April 19, 1932.

Petition for rehearing denied August 27, 1932.

P. H. *Odom,* for Relators;

*Roswell King, L'Engle & Shands* and *F. P. Fleming,* for Respondents.

HUTCHISON, Circuit Judge.—This is an action of original jurisdiction in this Court in the nature of quo warranto, brought against Duval County to prohibit it from collecting tolls on the bridge built by it across the St. Johns River at Jacksonville.

The information was filed in the name of the State by the Attorney-General joined by certain individual co-relators. Upon the issuance and service of the writ, the defendant demurred to the information. This hearing is on the demurrer.

From the allegations in the information admitted by the demurrer, the bridge was originally constructed by Duval County under authority of Chapter 7462, Laws of Florida, approved May 8, 1917. The construction was financed by a county bond issue of $950,000.00 under the provisions of said statute, and an additional issue of $250,000.00 under authority of Chapter 8672 of the Laws of 1921. The bridge was completed and put in operation in 1921, and has been operated by Duval County since that time.

The County, as authorized by the original Act, in order to pay for the cost and maintenance of the bridge and its operation, has continuously collected tolls on all traffic across the bridge since it was opened to the public. Out of the tolls so collected, after paying operating and maintenance costs, the County has been able to pay or redeem all of the original and additional issues of its bridge bonds, aggregating $1,200,000.00, with the exception of $137,000.-00, which are still outstanding and unpaid. The County also has accumulated an additional sum of $627,000.00 out of the tolls, which amounts to a surplus of $490,000.00 above all outstanding bonds.

The Legislature in 1931, (Chapter 15188, approved June 4, 1931), authorized an election in Duval County to determine, first, whether new approaches should be built to the bridge, and second, whether tolls should be abolished. The election was held on Nevember 30, 1931, and resulted in a majority vote against both proposals. The vote being against the new approaches and in favor of the tolls, the County, after paying the operating and maintenance costs of the bridge and after retiring all the remaining bridge bonds, is now required by Section 5 of the Act of 1931 to apply the balance of all funds realized from the tolls towards the liquidation of its other bonded debt.

The County is enforcing a system of tolls on the bridge in accordance with its authority under the original construction Act (Chapter 7462, Act of 1927) and the subsequent Act of 1931 (Chapter 15188). These proceedings are brought to restrain the further collection of tolls and to declare the bridge free, by challenging the power and authority of the County to collect tolls under either of the Acts.

The information relates in detail the facts and circumstances purporting to show the absence of any authority or power in the County to continue its collection of the

tolls, and its alleged usurpation of that power without warrant. The demurrer of the County raises the legal sufficiency of the grounds set forth in the information as a challenge of its power and authority to proceed under the Statutes in the collection of the tolls.

It is contended by the Relators that the collection of further tolls is not authorized under the original Act of 1917, authorizing the construction of the bridge, for the reason that the power granted by that Statute was exhausted when the collection of tolls reached an amount sufficient to pay the bonds and to provide for the future repairs and maintenance of the bridge. The information relates that the County has already collected tolls sufficient to pay off all of its bridge bonds, and that it has an additional amount on hand, as a surplus or sinking fund, sufficient to take care of future maintenance and operation of the bridge. For that reason it is contended that the purposes for which the tolls were originally authorized have been fulfilled and discharged; and that the Statute is now *functus officio* and no longer operative as legislative authority for the collection of tolls on the bridge.

Chapter 15188, enacted in 1931, it is contended, is unconstitutional and does not extend or enlarge the County's authority to collect the tolls originally authorized, but now no longer existing, under Chapter 7462. The information details the facts with regard to the passage of Chapter 15188, and enumerates various alleged encroachments on the State and Federal Constitutions.

The surplus fund of $490,000.00 held by the County, according to the contention of the relators, "would be sufficient to pay the cost of future repairs and operations of the bridge." From this statement of facts it is contended that, the purposes for which tolls were authorized under the Act of 1917 having been fulfilled and completely ac-

complished, the power for collecting tolls as conferred by the Act has become exhausted and at an end.

By Section 6 of Chapter 7462, Laws of 1917, the tolls were authorized not only to liquidate the bridge bonds, but to pay for "the operation, maintenance and repair of the bridge, and the approaches thereto." In fact, the operation, maintenance and repair costs of the structure are given first order or preference as enumerated charges against the funds collected from the tolls. It is also to be noted that the "approaches" to the bridge, as well as the bridge itself, are to be maintained and repaired out of the tolls.

It is contended by the relators that "the cost of operating and maintaining the bridge as a free bridge would not exceed the sum of $25,000.00;" and that this amount could be realized each year from the interest on the $490,000.00 surplus on hand. From this it is contended that the bridge has now accumulated a fixed surplus which will yield a sufficient interest return to pay for the operation and maintenance of the bridge in future years.

The relators estimate an annual interest yield of $25,-000.00 on the net surplus of $490,000.00 which will be on hand after deducting and allowing for the remaining $137,-000.00 of outstanding bonds. This amounts to an interest return of slightly over 4 per cent annually on the surplus fund. It is not contended in the information that this return can be obtained. It is not shown how, or in what securities the funds can ve invested to yield that return. And what is of the most importance, we are not informed by what statute or authority of law, the County of Duval would be warranted at this time in entering the investment field to purchase securities yielding an interest return sufficient to meet the figure estimated by the relators. Furthermore, until the bonds now outstanding are actually paid, they cannot be disregarded as a non-existing charge against

the tolls, although there may be funds on hand amply sufficient at this time to pay them. Provision for payment of the bonds is not the legal equivalent of payment. It requires no great strain of the imagination to conceive at this time of a financial disaster which would wipe out the entire existing cash surplus. And if this cash were to be invested in securities to yield better than a four per cent. return, as would be necessary to sustain the relators' plan of financing the operation of the bridge, it is entirely possible that the earnings of the securities, or even the securities themselves, might be lost, or seriously impaired, through financial reverses affecting the securities. It must be apparent from these observations that the relators have advanced nothing more than a theory for financing the future operation of the bridge. And the theory, as we have seen, does not purport to cover the entire operation. At most, it provides for the operation of the bridge, and makes no provision for its approaches. Furthermore, the theory is based on an estimated earning from the investment of an existing fund, where there is no law authorizing the County to make such investment, and when the investment, if made, becomes so hazardous as to affect its value and security and to destroy its function and purposes.

The Act of 1917 (Chapter 7462) entrusts the operation and control of the bridge into the hands of the County Commissioners, who are elected by the people, and who are responsible to the people for their management of the property. The County Commissioners are an executive body, charged by law with the discretionary power and business judgment in the management of the bridge, the same as all other public property coming under their control. To that Board the law has passed the business management and financial charge of the bridge, subject to such limitations as have been prescribed by the Legislature.

The Statute, in placing the bridge under the management

of the County Commissioners, has vested in them the power to levy and collect tolls found to be necessary to meet the cost and expenses incident to the operation of the property. When the law charges them with the duty of operating the bridge it places in their hands the power to raise funds through tolls to pay for the expenses incurred by them in such operation.

The relators now propose to take away from the County Commissioners the source of revenue received through tolls, and to force upon them a plan for financing the future operation of the bridge, based upon a theory not found within the Statutes and one that is not in harmony with the principles of ownership and control of County property.

The Statute contemplates that the County Commissioners in their control of the bridge shall exercise their own judgment as to the proper management of the property, to the end that it shall best serve the public needs, now and in the future. They are charged with the maintenance and repair of the structure. It is their problem to determine what maintenance and repairs are required and to make their own estimates of the cost of such work, and to plan their own methods for financing it.

It must be apparent that Chapter 7462, Acts of 1917, is not *functus officio,* as the relators contend. The facts related in the information show that the purposes and objects, for which the tolls were originally authorized, have not been satisfied or fulfilled. The power to collect the tolls has not been exhausted, under the Statute, but continues in the County as originally given by the Legislature. This Statute authorized Duval County to construct and operate a toll bridge across the St. Johns River. The constitutionality of the act was sustained in State ex rel Young v. Duval County, 76 Fla. 180, 79 So. 692. The act has never been repealed and it is still in force and effect. In so many words, it authorized a "toll bridge," and there

is nothing in the act providing that it should cease to be a toll bridge when any particular sum of money is collected or on any other contingency. The fundamental conception of the writ of quo warranto in this case is that Chapter 7462 grants authority to operate a toll bridge only for a limited period of time or under limited conditions; but a fair construction of the act does not sustain this contention. The authority granted the County was to build either a toll bridge or a free bridge. Before the County was authorized to construct any bridge, the electors were authorized and required to determine whether they would build a toll bridge or a free bridge. This alternative having been decided by the voters, in favor of a toll bridge, the character of the bridge to be constructed, that is, whether toll or free, was fixed before bonds were issued, the money spent, or taxes levied. The character of the proposed bridge is brought out clearly in the title of Chapter 7462. The title authorizes the County to issue bonds for the construction of a bridge and provides for an election to determine whether the bridge should be a free bridge or a toll bridge. Right at the beginning, therefore, the legislation which resulted in the construction of the present bridge gave everybody notice that the bridge which was to be constructed would either be a toll bridge or a free bridge, depending upon the decision of the electors in the County. The first section of the statute required the holding of an election, not only to determine whether bonds should be issued to construct a bridge, but for the purpose of "determining at such election whether the bridge to be constructed should be a free bridge or a toll bridge." By the second section of the statute all of the qualified electors of the County, whether freeholders or not, were authorized to vote "on the question whether said bridge should be a free or a toll bridge." The form of ballot set out in Section 3 contained explicit provisions

for voting ''for a free bridge'' or ''against a free bridge.'' The issue before the voters was clear and definite. They could decide whether the County was to build a free bridge or a toll bridge. They were not told or informed by the ballot or any provision in the statute that, if the County used its credit and taxing powers to construct a toll bridge, the power to collect tolls would be limited to any period of time or by any conditions other than that the toll should be ''fair and reasonable.'' The 4th Section of the statute provided that if ''the electors voting on the question whether said bridge shall be a free bridge or a toll bridge shall have voted against a free bridge, then the county commissioners shall collect a reasonable toll and charge for passage over and upon said bridge,'' etc. No time limit or conditions on the right to collect tolls was stated. If, however, it appeared from the returns of the election that the voters ''shall have voted for a free bridge, then and in that event no tolls or charges shall be collected, except from interurban and street cars and others public service corporations using said bridge.'' These provisions of the statute make it abundantly clear that the Legislature vested in the County, through its qualified electors, the right to determine whether it would build a free bridge or a toll bridge. The character of the structure was therefore fixed at the beginning as a toll bridge.

In order to prevent excessive tolls or charges, it was provided in the statute (Section 5) that the county commissioners should initially fix tolls and charges and have them published, together with a notice of application to one of the Judges of the Circuit Court for Duval County, for approval or disapproval. Any taxpayer could file objections to the schedule of tolls and charges. The Circuit Judge, after hearing objections and taking testimony, was required to enter an order ''approving such tolls and

charges in whole or in part, or increase or decrease the same as he shall determine from the evidence to be fair and reasonable." Tolls and charges so fixed should not be changed for a period of more than two years, "without first obtaining leave of Court to submit a new schedule of tolls and charges." The tolls fixed by the Circuit Judge should not become effective until thirty days after publishing the order. The system provided by this section for the determination of fair and reasonable tolls, shows how carefully the interests of the public were safeguarded by the statute. The machinery and procedure in question were expressly approved by this Court in State ex rel. Young v. Duval County, supra.

Section 5 of the Statute, Chapter 7462, Act of 1917, gives every taxpayer the right to file objections to the tolls, and an opportunity to be heard on his objections. The Judge of the Circuit Court is charged with the duty of passing on all complaints and is authorized to take the testimony of any person to sustain his complaint. The tolls, by express provision of the Statute, do not become effective until the Circuit Judge has heard all complaints and considered all objections, and the schedule of tolls is found to be reasonable and fair, and is approved by him. The Statute provides for full publication of all schedules of tolls. Every interested party is given opportunity to voice his complaints, and a fair and sufficient means for hearing his complaints is offered by the provisions of the Statute under which the tolls are charged.

The Relators have made no reference to this provision of the Statute. They have shown in their information no attempt to obtain relief against the tolls by the method provided in the Statute. Nor have they suggested any reason why relief might not be obtained on a hearing of their complaint before the Circuit Judge as the Statute contemplates.

Instead of proceeding in an orderly manner under the provisions of the Statute for the hearing and determination of their objections, the relators have resorted to quo warranto against the County.

It is one of the fundamentals of procedure in quo warranto, that the writ will not be issued where there is another ample and sufficient remedy provided by law for the relief sought.

In the case of State vs. Tampa Water Works Company, 57 Fla. 533; 48 Sou. 639, it was sought to oust a waterworks company from its franchise by quo warranto for an alleged abuse of the powers given it under its franchise. This court pointed out that there was then a Statute authorizing full and complete relief by procedure in the Circuit Court, and for that reason denied the writ of quo warranto.

This Court has already passed on the validity of the Statute authorizing the collection of tolls when it was brought into question and construed in the case of State, ex rel. Young vs. Duval County, supra, Section 5, involving the provisions for fixing the toll rates and hearing complaints, was especially considered and approved by this Court. It was held that the method prescribed by the Statute for fixing the tolls, and the procedure devised for hearing and determining complaints against the tolls, were valid, and were adopted by the Legislature under sanction and authority of the Constitution.

Section 30, Article 16, of the Constitution gives the Legislature full power to pass laws for the correction of abuses and to prevent unjust discrimination and excessive charges by persons and corporations performing services of a public nature, and to enforce such laws by adequate penalties or forfeitures. This section was considered and applied in the Tampa Water Works case. Chapter 7462, Laws of 1917, is an effective and continuing exercise of the power given the Legislature by Section 30, Article 16, of the Con-

stitution, because the Circuit Judge is authorized to determine whether the tolls fixed by the County Commissioners are "fair and reasonable," and, if not, to increase or decrease them accordingly. This power given the Circuit Judge is the Legislature's method of enacting a law to prevent unjust discrimination and excessive charges. There is no complaint here about unjust discrimination, the only point is excessive charges, or any charges at all. The Statute authorizes the collection of tolls under existing conditions and future contingencies, and it is clear that the Legislature had the power to vest in the Circuit Judge, under the express grant contained in Section 30, Article 16, the right to determine what is, and what is not excessive, and what tolls are required to meet the purposes of the Statute.

This thought is emphasized by the fact that Section 11, of Article 5, gives the Circuit Courts jurisdiction of cases which involve the legality of any tolls, as well as any other matter which the Legislature may provide. See State ex rel. Young v. Duval County, supra.

The duty of the Circuit Court to fix reasonable tolls, if it refused to act at all, may be enforced by mandamus. The same is true about the functions of the County Commissioners. The machinery provided by the Act of 1917 is mandatory and can be put in motion by any interested person by an action of mandamus, just as was pointed out in the Tampa Water Works Case, where the Court said that "this duty of the respondent may be enforced by mandamus." In the Tampa Water Works Case, the Court said that in case of gross or wilful refusal to comply with the lawful requirements of the City, "the Statute apparently affords adequate remedy." The remedy provided by the Legislature in obedience to Section 30, Article 16, of the Constitution of Florida, is a hearing before the Circuit Judge under the Act of 1917 (Chapter 7462). It is apparent therefore that the Statute itself provides a pro-

186

cedure and remedy with regard to the complaint against the collection of tolls, and that this remedy must be resorted to before quo warranto may be invoked.

It appearing from the reasons above pointed out that the demurrer should be sustained it becomes unnecessary to discuss the other questions raised by the demurrer.

It is ordered that the demurrer be and the same is hereby sustained and the writ of quo warranto is hereby dismissed at the cost of corelators.

BUFORD, ELLIS, BROWN AND DAVIS, J.J., concur.