CIKLIN, J.
In this appeal, Eagletech Communications, Inc. (“Eagletech”) is seeking review of the trial court’s final order dismissing its Fifth Amended Complaint with prejudice. We affirm the trial court’s dismissal of the complaint; however, we reverse the order to the extent it dismissed the complaint with prejudice.
BACKGROUND

Factual Allegations 
[1]

Eagletech was a Nevada startup corporation with its principal place of business located in Fort Lauderdale, Florida. Ea-gletech’s founder had developed and patented both a “telecommunications ‘core’ technology” and a method for implementing that technology. Eagletech required, but lacked, the capital that it needed to develop and market its technologies. To meet its capital requirements, Eagletech underwent a series of three rounds of financing involving the twenty-nine named defendants.
In November 1998, Eagletech’s founder was introduced to John Serubo, who in turn introduced him to the Bryn Mawr Investment Group (“Bryn Mawr”) and Lloyds Bahamas Securities, Ltd. (“Lloyds”). In June 1999, Bryn Mawr promised to commit an aggregate amount of $5 million (the “First Funding”). As conditions of providing capital, Bryn Mawr and Lloyds required Eagletech, among other concessions, to hire LBC Capital Corp. (“LBC Capital”) as its consultant and to hire Robert Dobbs as its chief operating officer. Eagletech reluctantly agreed to the requirements based upon certain representations from Bryn Mawr, Lloyds, LBC Capital, and Dobbs. Instead of the $5 million initially sought, Eagletech netted only $950,000 due in part to prepaid contract fees required as a condition of funding. After securing an extension on Dobbs’ employment agreement as a condition of further funding, Bryn Mawr and Lloyds informed Eagletech that they were not capable of providing more capital.
Because Eagletech was still in desperate need of capital, Eagletech subsequently entered into a funding agreement in February 2000 with T.R. Kessler and Richmond Associates, both affiliates of the First Funding investors. This agreement was represented to be additional funding in the amount of $490,000 (the “Second Funding”). Dobbs attended the closing and accepted a single promissory note instead of cash. The promissory note contained privileges to convert portions of the note into Eagletech’s stock.
Immediately thereafter, also in early February 2000, Eagletech was introduced by a member of LBC Capital to John Dorocki at Salomon Smith Barney (“SSB”) in New York. Dorocki was employed by SSB where he held a high management position. Eagletech decided to enter into a financing transaction with Dorocki and his investors based on Dorocki’s representations that SSB would underwrite this funding and that the financial transaction would have the source and backing of SSB (the “Third Funding”).
*860 During March and April 2000, Eagletech negotiated on the financial requirements of this Third Funding with Dorocki and the investors that he had organized. On April 5, 2000, Dobbs traveled to Chicago to meet with some of the potential investors referred to in the Fifth Amended Complaint as Paradigm.[2] Around this time, Dorocki and SSB formed Trinity Technology Management, Inc. to fund the transaction separate and apart from SSB which, according to Dorocki, was customary for transactions such as the Third Funding here.
Between April 5 and April 16, all the named defendants set about executing short sales to drive down the price of Eagletech stock prior to their investment.[3] This short-selling[4] activity resulted in a sharp decline in Eagletech’s stock price. Eagletech’s board of directors subsequently decided, on April 16, 2000, to accept the terms of the Third Funding. The terms approved by Eagletech’s board provided that there would be no short-selling of Eagletech’s stocks by the Third Funding investors or any of their affiliates, agents, or servants.
On Friday, May 5, 2000, at 4:27 p.m., Robert Coyne, attorney for Paradigm and Trinity (two of the investment groups in the Third Funding), sent an email to Christopher Flannery, an attorney and one of Eagletech’s board members. The email stated, “Your changes to the term sheet are accepted. I have made several changes, none of which I believe are material.” In fact, Coyne had altered the term sheets, enlarging the definition of a “DRP transaction” to include a short sale in a single day of up to 20% of the weekly trading volume of Eagletech’s stock. This altered definition of the term “DRP transaction” was not the industry definition of the term and would permit the investors to circumvent the “no short-selling” clause of the agreement. On May 12, 2000, relying on Coyne’s representation that none of the changes he had made were material, combined with Coyne’s acceptance of the term redlined by Eagletech’s attorney, Eagle-tech’s board voted to accept the term sheet sent by Coyne on May 5, 2000.
The Third Funding closed on May 16, 2000. The investors in this funding received shares of Eagletech preferred stock which were convertible "into common shares. The conversion was based on the market price of the common stock and there was no limit to the number of common shares into which the preferred shares could convert.[5]
On May 14, 2001, Paradigm (a group of Third Funding investors) filed a Form 144 with the SEC announcing its intention to sell one million shares of Eagletech’s restricted stock. As of its filing, Paradigm owned no shares of Eagletech’s stock, re *861 stricted or otherwise. According to Eagle-tech, Paradigm filed this Form 144 with the purpose of triggering a shareholder sell off. Between May 14, 2001 and May 18, 2001, Eagletech’s stock plummeted over 40%, from $.73 to $.42. On May 18, 2001, Paradigm caused conversion notices to be filed, seeking to convert its preferred stock to common stock. Eagletech refused to comply with the conversion requests.

Procedural History

In November 2001, Eagletech filed its initial complaint in Miami-Dade county against the investors in the three rounds of capital funding described above. Many of the defendants filed motions to dismiss, but before the trial court ruled on any such motions, Eagletech amended its complaint in June 2002.
In October 2002, Eagletech filed its second amended complaint. Most of the defendants again filed motions to dismiss. In February 2003, Eagletech, with leave of the trial court, filed its third amended complaint. In May 2003, the case was transferred to the Seventeenth Judicial Circuit in Broward County. In August 2004, the trial court denied LBC Capital’s motion to dismiss.
In December 2005, with leave of the trial court, Eagletech filed its fourth amended complaint. The defendants again filed motions to dismiss. In April 2007, the trial court entered an order denying two defendants’ motion to dismiss for lack of personal jurisdiction. In that order, the trial court wrote that the “Fourth Amended Complaint adequately sets forth allegations of a conspiracy to commit a tortious act.” Without any further rulings on the remaining motions to dismiss the fourth amended complaint, the trial court entered an order transferring the case to the complex business civil division.
In October 2008, Eagletech filed its Fifth Amended Complaint. Eagletech’s complaint contains 142 numbered paragraphs spanning forty-nine pages and raises eleven counts. In this appeal, Ea-gletech only argues that five of those counts were sufficiently pled: fraud (count one), conspiracy (count two), violations of the Florida RICO statutes (counts three and four), and violations of the Florida Securities Investors Protection Act, i.e. securities fraud (count six). Most (if not all) of the defendants filed motions to dismiss the Fifth Amended Complaint. Following a hearing on the motion, the trial court entered an order granting the dismissal of the Fifth Amended Complaint with prejudice. Subsequently, the trial court entered final orders as to all named defendants. Eagletech now appeals the dismissal of its action with prejudice.
ANALYSIS
A dismissal for failure to state a cause of action is reviewed de novo. Wells v. Wells, 24 So.3d 579, 582 (Fla. 4th DCA 2009). “A motion to dismiss for failure to state a cause of action admits all well pleaded facts as true, as well as reasonable inferences that may arise from those facts.” Id. (emphasis added) (citation and quotation marks omitted).
Count One — Fraud
“To state a cause of action for fraud in the inducement, the Plaintiff must allege (a) a misrepresentation of a material fact; (b) that the representor of the misrepresentation knew or should have known of the statement’s falsity; (c) that the rep-resentor intended that the representation would induce another to rely and act on it; and (d) that the plaintiff suffered injury in justifiable reliance on the representation.” Samuels v. King Motor Co. of Fort Lauderdale, 782 So.2d 489, 497 (Fla. 4th DCA 2001). Furthermore, “[i]n order for a claim of fraud in the inducement to with *862 stand a motion to dismiss, it must allege fraud with the requisite particularity required by Florida Rule of Civil Procedure 1.120(b), including who made the false statement, the substance of the false statement, the time frame in which it was made and the context in which the statement was made.” Bankers Mut. Capital Corp. v. U.S. Fid. & Guar. Co., 784 So.2d 485, 490 (Fla. 4th DCA 2001).
In count one of the Fifth Amended Complaint, Eagletech alleged fraud and sought damages from all twenty-nine named defendants. The count re-alleged the first seventy-three paragraphs of the complaint and then included an additional ten paragraphs. In paragraph seventy-four of the complaint, Eagletech then listed nine “misrepresentations” that were allegedly made to induce Eagletech to agree to the terms of the three rounds of funding. Those allegations, however, were all insufficiently pled.
Many of the statements were simply inactionable as either statements of opinions or promises of future action. See Wadlington v. Cont'l Med. Servs., Inc., 907 So.2d 631, 632 (Fla. 4th DCA 2005) (“As a general rule, a false statement of fact, to be a ground for fraud, must be of a past or existing fact, not a promise to do something in the future.” (citation and quotation marks omitted)). To the extent that some of the statements were false statements of past or existing facts, Eagletech failed to identify who made the statements and in what context. In Simon v. Celebration Co., 883 So.2d 826 (Fla. 5th DCA 2004), the Fifth District wrote, “The lack of specificity is particularly troublesome here where nine separate defendants are lumped together in each count in a complaint that often fails to particularize which of the nine defendants made which statements.” Id. at 833. Here, rather than lumping a mere nine defendants together, Eagletech lumped twenty-nine defendants together and failed to identify which defendant made which statement. Thus, the trial court correctly concluded that these other allegations of fraud lacked the required specificity.
On appeal, Eagletech notes that its fraud claim re-alleged the first seventy-three paragraphs of the complaint and argues that in paragraphs fifty, and fifty-three to fifty-five of the Fifth Amended Complaint, it stated facts with the requisite particularity to support a claim for fraud in the inducement. In those paragraphs, Eagletech alleged that on April 16, 2000, its board of directors approved terms for the Third Funding that included a “no short-selling clause.” On Friday, May 5, 2000, at 4:27 p.m., Robert Coyne, who Eagletech identifies as “attorney for Defendants Paradigm and Trinity,” sent an email to Christopher Flannery, an attorney and a member of Eagletech’s board of directors. The email stated, “[y]our changes to the term sheet are accepted. I have made several changes, none of which I believe are material.” According to the complaint, Coyne’s changes in fact were material as they permitted the investors to circumvent the “no short-sell clause” by modifying the definition “DRP transaction” to permit certain short-selling transactions. Eagletech alleged that the industry definition of “DRP Transaction” did not include short-selling transactions. Ea-gletech further claimed that it relied on Coyne’s representation that he had accepted Eagletech’s changes and that none of the changes he made to the final draft were material.
We agree that the paragraphs cited by Eagletech could support a fraud claim against a single appellee — Trinity Technol *863 ogy Management, Inc.[6] Nevertheless, the trial court correctly dismissed Eagletech’s single fraud count because Eagletech im-permissibly comingled separate and distinct fraud claims in a single count. See Fla. R. Civ. P. 1.110(f) (“Each claim founded upon a separate transaction or occurrence ... shall be stated in a separate count ... when a separation facilitates the clear presentation of the matter set forth.”); KR. Exch. Servs., Inc. v. Fuerst, Humphrey, Ittleman, PL, 48 So.3d 889, 893 (Fla. 3d DCA 2010) (“A party should plead each distinct claim in a separate count, rather than plead the various claims against all of the defendants together.”). The transaction described in paragraphs fifty-three to fifty-five relating to events that occurred around the Third Funding are distinct from the alleged misrepresentations made by different parties to induce Eagletech to enter into the First Funding. Although the trial court was correct in dismissing the fraud claim because it was improperly pled, the allegations in the paragraphs cited above demonstrate that the complaint is amendable to state a cause of action.
Count Two — Civil Conspiracy
 In Florida, “[a] civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.” Raimi v. Furlong, 702 So.2d 1273, 1284 (Fla. 3d DCA 1997). “General allegations of conspiracy are inadequate.” World Class Yachts, Inc. v. Murphy, 731 So.2d 798, 799 (Fla. 4th DCA 1999). A complaint must “set forth clear, positive, and specific allegations of civil conspiracy.” See id.
In its conspiracy count, Eagletech alleged that the named defendants “combined, agreed, and conspired with each other to devise a scheme.” Eagletech never explained what this alleged “scheme” was. As such, Eagletech failed to clearly set forth the “act” — the second required element for pleading a conspiracy — which the appellees allegedly agreed to undertake. As such, the trial court correctly concluded that the complaint “makes only the barest allegations about the alleged conspiracy, with no details as to the unlawful scheme or the actual agreement of the parties.”
Eagletech’s conspiracy count was also insufficient because Eagletech failed to allege sufficient facts from which a reasonable inference could be drawn that all of the named defendants participated in a conspiracy to defraud Eagletech. Eagle-tech’s complaint merely speculates that the appellees all participated in some conspiracy because they ultimately received some benefit from the transactions. But, “[t]o assume or speculate ... that the [appel-lees] participated in a conspiracy ... merely because they ultimately received some benefits from the [investments] is insufficient for the imposition of liability against them.” Raimi, 702 So.2d at 1285.
*864 Counts Three and Four — Violations of Florida’s RICO Statute
In counts three and four of the Fifth Amended Complaint, Eagletech alleges violations of The Florida Civil Remedies for Criminal Practices Act — Florida’s RICO equivalent. Section 772.103, Florida Statutes, makes it unlawful for any person “[t]hrough a pattern of criminal activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property,” or for a person “[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity,” or to conspire to do so. § 772.103, Fla. Stat. (2000). Section 772.104(1) provides civil remedies for violations of section 772.103.
Section 772.102 .defines a “pattern of criminal activity” as “engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents.” § 772.102(4), Fla. Stat. (2000) (emphasis added).
Thus, to bring a RICO action in Florida, a plaintiff has to show “there has been some sort of ongoing criminal behavior.” Ginsberg v. Lennar Fla. Holdings, 645 So.2d 490, 501 (Fla. 3d DCA 1994). The purpose of the statutes “is to punish, through civil penalties, actions which are ongoing and criminal in nature.” Id. To maintain an action under section 772.103, a plaintiff must plead the necessary predicate acts or continuity of endeavor. See id.
Eagletech has not properly alleged the necessary predicate acts in its Fifth Amended Complaint. At best, the complaint alleges potential fraudulent activity surrounding the Third Funding. Nevertheless, Eagletech has attempted to allege multiple criminal acts all related to the Third Funding. For example, Eagle-tech alleged that the appellees committed mail fraud when they mailed the conversion notices. These allegations are insufficient, however, as section 772.102(4) states, “For the purposes of this chapter, the term ‘pattern of criminal activity’ shall not include two or more incidents of fraudulent conduct arising out of a single contract or transaction against one or more related persons.” § 772.102(4).
Thus, even if mailing the conversion notices constituted “fraudulent conduct,” this arose out of the same contract or transaction with Eagletech as the alleged misrepresentations that occurred in inducing Eagletech to agree to the sale of the preferred stock. As such, Eagletech’s complaint fails to allege “at least two incidents of criminal activity” as required. We also note that for the purpose of establishing a common enterprise consisting of the named defendants, Eagletech has treated the three funding agreements as a single transaction. As such, Eagletech would have had to have pled at least one incident of criminal activity that was unrelated to any of the three funding agreements in order to sufficiently plead its RICO claims.
Eagletech’s RICO claims are also insufficient in that the allegations merely track the language of the statute in an attempt to allege a cause of action. But, “[a] party does not properly allege a cause of action by alleging in conclusive form, which tracks the language of the statute, acts which lack factual allegations and merely state bare legal conclusions.” See Ginsberg, 645 So.2d 490 at 501.
Thus, the trial court properly dismissed Eagletech’s two counts for violations of the Florida Civil Remedies for Criminal Practices Act.
*865 Count Six — Florida’s Securities Investor Protection Act
Count six of the Fifth Amended Complaint alleges violations of the Florida Securities and Investor Protection Act, and in particular violation of section 517.301, Florida Statutes (2000).[7] Section 517.211(2) creates a civil remedy for a violation of section 517.301:
Any person purchasing or selling a security in violation of s. 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.
§ 517.211(2), Fla. Stat. (2000) (emphasis added). The Florida Supreme Court has interpreted the emphasized language above as requiring buyer/seller privity to maintain a cause of action for securities fraud under the Florida statutes. See E.F. Hutton & Co. v. Rousseff, 537 So.2d 978, 980 (Fla.1989).
In count six, Eagletech alleged that the named defendants had violated section 517.301(1) via a market manipulation scheme. According to Eagletech, the defendants engaged in short-selling of Eagletech’s stock from a “naked position” with the intent of driving down the price of the stock.[8] Because the investors in the Third Funding had received floorless convertible preferred stock, they would benefit from the low stock price because they could convert their preferred shares into a huge number of common shares to cover their previously naked short positions.
Eagletech’s Fifth Amended Complaint fails to allege that Eagletech was the purchaser in the allegedly fraudulent naked short-sale transactions. To the contrary, Eagletech alleges that the short sales occurred on the open market. Eagletech argues that the conversion demands made by the investors from the Third Funding constituted a purchase and sale of its stock. This argument fails for two reasons. First, the exercise of the conversion feature in the preferred stock from the Third Funding does not qualify as a purchase or sale of a security. See Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C., 223 F.Supp.2d 435, 446 (S.D.N.Y.2001). Second, Eagletech alleged in its complaint that it refused to comply with the conversion requests. As such, Eagletech has failed to allege the requisite buyer/seller privity.

Dismissal with Prejudice

Eagletech argues that even if the trial court correctly concluded that the Fifth Amended Complaint was legally in *866 sufficient, the trial court abused its discretion in dismissing its complaint with prejudice rather than with leave to amend. We agree. Eagletech was never given an opportunity to cure the defects in the pleading found by the trial court. See Horton v. Freeman, 917 So.2d 1064, 1066 (Fla. 4th DCA 2006) (“[T]rial courts must generally afford a litigant an opportunity to cure a defect in the pleading before dismissing it with prejudice.”); Gladstone v. Smith, 729 So.2d 1002, 1003 (Fla. 4th DCA 1999) (“A claim should not be dismissed with prejudice without giving the plaintiff an opportunity to amend the defective pleading, unless it is apparent that the pleading cannot be amended to state a cause of action.” (citation and quotation marks omitted)).
Prior to the trial court’s dismissal of the Fifth Amended Complaint, no previous trial court hearing this case had granted any motion to dismiss previous complaints in their entirety for failure to state a cause of action. To the contrary, the record contains orders wherein prior trial judges had denied motions to dismiss based on a failure to state a cause of action. Thus, although Eagletech has filed six complaints in this case over seven years, the dismissal being appealed from in this case is the first time that a trial court had ruled that Eagletech’s complaint was insufficient.
The causes of action which Eagletech argues on appeal were sufficiently pled have remained virtually unchanged since Eagletech filed its Third Amended Complaint in February 2003. In August 2004, the previous trial court entered an order denying LBC Capital’s motion to dismiss which raised the same issues as the motions the trial court ultimately granted. Furthermore, in April 2007, the previous trial court entered an order denying a motion to dismiss for lack of jurisdiction. In that order, the trial court wrote that the “Fourth Amended Complaint adequately sets forth allegations of a conspiracy to commit a tortious act.” Thus, Eagletech was left to believe for a period of at least five years that its complaint sufficiently pled the causes of action at issue in this appeal.
Florida Rule of Civil Procedure 1.190(a) states that leave of the court to amend a pleading should be “given freely when justice so requires.” This rule requires giving a party leave to amend a complaint where, as here, after a prior judge rules that a complaint is legally sufficient, a successor judge later determines that an amended complaint which retains the same counts and factual allegations fails to state a cause of action. See Radaker v. Houston, Cooper, Shahady & Frazier, P.A., 608 So.2d 940-41 (Fla. 4th DCA 1992) (“However, based upon the trial court’s earlier order denying appellees’ motion to dismiss appellant’s amended verified complaint, we hold the trial court abused its discretion when it dismissed appellee’s second amended verified complaint with prejudice.”). It is not the number of amendments which determine when a complaint should be dismissed with prejudice, but rather the number of “ineffective attempts to state the same cause of action” which must be considered. See Walters v. Ocean Gate Phase I Condo., 925 So.2d 440, 443 (Fla. 5th DCA 2006) (“Generally three ineffective attempts to state the same cause of action ... are enough.” (emphasis added) (quoting Trawick’s Florida Practice & Procedure § 14-2 at 225 (2006))).
CONCLUSION
We affirm the trial court’s ruling dismissing Eagletech’s Fifth Amended Complaint for failure to state a cause of action. We find, however, that based on the orders of the previous trial judges denying similar *867 motions to dismiss the third and fourth amended complaints, the trial court erred in dismissing the Fifth Amended Complaint with prejudice. Accordingly, we reverse the trial court’s order to the extent that it dismisses the Fifth Amended Complaint with prejudice and remand this cause to the trial court with instructions to allow appellant leave to amend its complaint.

Affirmed in part, reversed in part, and remanded for further proceedings.

MAY, C.J, and STEVENSON, J., concur.

. The following facts are taken from Eagle-tech’s Fifth Amended Complaint and supporting documents, which we must accept as true in reviewing a motion to dismiss for failure to state a cause of action. See Edwards v. Landsman, 51 So.3d 1208, 1213 (Fla. 4th DCA 2011) ("A court may not go beyond the four corners of the complaint and must accept the facts alleged therein and exhibits attached as true.” (citation and quotation marks omitted)).

. The Paradigm group of investors included the following nine named defendants: Paradigm Group II, L.L.C.; The Paradigm Group, Inc.; Paradigm Millennium Fund, L.P.; Paradigm/Eagletech, L.P.; Goulding Trust; Randal S. Goulding; Sheldon Drobny; Thomas Papoutsis; and Sigmund Eisenschenk. The appeal as to these defendants was dismissed as untimely filed.

. We reiterate that the above facts are cited as alleged in the Fifth Amended Complaint. We accept these facts as true only for the purpose of analyzing the sufficiency of the complaint.

. "An investor sells short when he sells a security that he does not own by borrowing the security, typically from a broker. At a later date, he 'covers' his short position by purchasing the security and returning it to the lender. A short seller speculates that the price of the security will drop.” ATSI Commc'ns, Inc., v. Shaar Fund, Ltd., 493 F.3d 87, 96 n. 1 (2d Cir.2007).

. This type of security is referred to as a "floorless” convertible security. See ATSI Commc'ns, 493 F.3d at 94.

. The paragraphs could also support a claim against the group of investors that the complaint refers to as Paradigm, but the appeal against those defendants was untimely filed and dismissed for lack of jurisdiction. As such, Eagletech can no longer assert any claims against those parties based on the facts it has alleged in its Fifth Amended Complaint. We recognize that in paragraph fifty-four, Ea-gletech alleged that Coyne was an "agent of ... LBC." Without more, however, an allegation of an agency relationship is a mere legal conclusion which we do not have to accept as true in analyzing the sufficiency of the complaint. This is distinguishable from the allegation in paragraph fifty-three that Coyne was the "attorney for Defendants Paradigm and Trinity.”

. Section 517.301(1) provides:
It is unlawful and a violation of the provisions of this chapter for a person:
(a) In connection ... with the offer, sale, or purchase of any investment or security, ... directly or indirectly:
1. To employ any device, scheme, or artifice to defraud;
2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
3.To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

. In its Fifth Amended Complaint, Eagletech explained that short-selling from a "naked position” means that the investor who sells the security does not own or have access to the stock when sold. That is, the naked short seller does not borrow the stock that he or she sells.