Jim FULLER, Clerk of the Circuit Court of Duval County, Florida, in his official capacity and on behalf of all those similarly situated, Plaintiff,

v.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. and MERSCORP INC., Defendants.

Case No. 3:11–CV–1153–J–20MCR.

United States District Court,
M.D. Florida.
Jacksonville Division.

June 27, 2012.

Ian Robert Mckillop, Timothy Wayne Volpe, Volpe, Bajalia, Wickes, Rogerson & Wachs, Jacksonville, FL, for Plaintiff.

Andrew B. Boese, Morgan, Lewis & Bockius, LLP*, Robert M. Brochin, Miami, FL, for Defendants.

## ORDER

HARVEY E. SCHLESINGER, District Judge.

THIS CAUSE is before this Court on Defendants' Motion to Dismiss (Dkt. 10), Plaintiff's Memorandum in Opposition (Dkt. 16), Defendants' Reply to Plaintiff's Opposition (Dkt. 21), and Plaintiff's sur-reply (Dkt. 24). This Court held a hearing on these motions following which the parties submitted additional material (Dkts. 27, 28, 31, 32, and 33).

In this case this Court is confronted with an old problem: the difficulty of reconciling new technology with old law, thus raising the centuries old separation of powers controversy. Technology moves rapidly whereas the law moves at glacial pace, and as custodians—not promulgators—of the law, courts frequently lack the power to rein in practices that comply with its letter, but perhaps not its spirit. Alexander Hamilton, when explaining the structure of the federal judiciary under Art. III, touched upon the difficulty facing this Court:

The Executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither force nor will, but merely judgment . . . .

This simple view of the matter suggests several important consequences. It proves incontestably, that the judiciary is beyond comparison the weakest of the three departments of power . . . .

(Alexander Hamilton, *The Federalist, No. 78, reprinted in* The Federalist: A Commentary on the Constitution of the United States, Book 2, 98, 99 (1942)). Here Plaintiff is asking the weakest branch of the federal government to resolve a question that is better suited for the Florida legislature. In the words of a Florida court, this case involves "the rub between the expanding use of electronic technology to track real estate transactions and our familiar and venerable real property laws that has generated the heat that led to this [case] and to countless others nationally." *Taylor v. Deutsche Bank Nat'l Trust Co.,* 44 So.3d 618, 623 (Fla. 5th DCA 2010). While the "rub" has indeed caused considerable friction, this Court—as least under present Florida law—lacks the power to add the necessary grease.

## I. HISTORY OF MORTGAGE RECORDING

To fully appreciate the importance of the issues before this Court, it is necessary to review the history of the recording of mortgages in the United States.

Since the founding of the American republic, each county in the United States has maintained records of who owns the land within that county. Most states track changes in ownership of land, including mortgages and deeds of trust, by maintaining records indexed through the names of grantors and grantees. These grantor-grantee indexes allow individuals and businesses contemplating the purchase or financing of land to investigate—or hire a title insurer to investigate—whether a seller or mortgagor actually owns the land being offered for sale or mortgage. Communities traditionally have elected their county recorders or registers of deed; these elections provide an important democratic check and balance in the preservation of property rights. A public, enduring, authoritative, and transparent record of all land ownership provides a vital information infrastructure that has proven indispensible in facilitating not only mortgage finance, but virtually all forms of commerce. County real property records are the oldest and most stable metric tracking the "American dream" of family homeownership.

To facilitate their service, county recorders charge modest fees on documents they record. Although the amount and the method of calculating these fees varies considerably, a charge of about thirty-five dollars for a mortgage is typical. County recorders use these fees to fund their offices and to contribute to county and state revenue. Some counties use real property recording fees to fund other county departments such as courts, legal aid offices, schools, and police.

For centuries, American mortgage lenders eagerly recorded their mortgages with county recorders because state land title laws created incentives for recording and disincentives for not recording. For example, if a mortgagee fails to record its mortgage properly and then someone subsequently buys or lends against the home and records its inter-

est, the subsequent purchaser or lender often can take priority over the first mortgagee. Similarly, if a mortgagee assigns a mortgage to an investor, that investor eagerly would record documentation reflecting the assignment to protect against the possibility that the original mortgagee would assign the same mortgage to a different investor.

Christopher L. Peterson, *Two Faces: Demystifying the Mortgage Electronic Registration System's Land Title Theory*, 53 Wm. & Mary L. Rev. 111, 114–15 (2011).[1] With this historical framework in mind, this Court turns to the facts that govern this controversy.

## II. FACTS OF THE CASE [2]

On October 31, 2011, Plaintiff initiated this action by filing his Class Action Complaint ("Complaint"), on behalf of himself and the other Florida Clerks of Circuit Courts, against Defendants Mortgage Electronic Registration Systems, Inc. and MERSCORP, Inc. (collectively, "MERS") in the Circuit Court, Fourth Judicial Circuit, in and for Duval County Florida.

Plaintiff maintains this is a "class action to recover millions of dollars in unpaid recording fees unlawfully avoided through a nationwide scheme perpetrated by MERS, its principals, and its members . . . ." (Dkt. 2, pg. 2). MERS is alleged to have developed and maintained a private system for tracking and recording interests in land, actions which Plaintiff alleges unlawfully interfere with and usurp the integrity of the public records system maintained by the Florida Clerks of Circuit Courts.

According to Plaintiff, it is the Florida Clerks of Circuit Courts who are the steward of the public records in each county, and the clerks are responsible for recording any and all instruments required or authorized by law that affect real property in that county. This system provides "a

1. Christopher Peterson is the Associate Dean for Academic Affairs and Professor of Law at the University of Utah, S.J. Quinney College of Law. Plaintiff cited this article to this Court during the hearing on the MERS' motion to dismiss. Professor Peterson's article, which is highly critical of the Mortgage Electronic Registration Systems ("MERS"), appears to be the intellectual foundation for much, if not all, of Plaintiff's theories for recovery. But Professor Peterson seems to recognize that recording of mortgages and subsequent assignments of those mortgages has never been required by law. Instead there are incentives for recording them and disincentives when they are not recorded.

In addition, Professor Peterson also appears to appreciate that complete relief resides with state legislatures and not the courts. Peterson writes:

Even county recorders who are reluctant to enter into court battles still can exert a positive influence on the law by encouraging state legislators to explicitly reassert traditional principles of recording law. State legislators should, at a minimum, consider enacting explicit bans on the use of nominees to obscure actual economic ownership of interests in land from the land records. Legislatures also could explicitly require that county records include recorded assignments reflecting each transfer of beneficial ownership of the loan from the original lender to the current owner prior to allowing home foreclosure, especially in nonjudicial foreclosure states. Moreover, state legislatures should consider legislation clarifying that a recording in the name of a nominee does not provide notice sufficient to perfect a mortgage or deed of trust within that state. This provision would empower a state's citizens with substantial negotiating leverage and—particularly in struggling states such as California, Florida, Nevada, and Ohio—would inject tremendous new energy into financial institutions' thus far lackluster efforts to modify ill-advised loans.

Peterson, *supra* at 158.

2. This Court's use of the word "facts" is solely for purposes of deciding the motion and is not intended to suggest those "facts" are necessarily the actual facts. *Kelly v. Curtis*, 21 F.3d 1544, 1546 (11th Cir.1994) (citation omitted).

mechanism by which private individuals can put others on notice of their interest in a particular parcel of real property," and "it protects the public by providing a reliable historical record of past and current ownership of all real property in the state [and for that service the Clerks charge and collect a fee]." *Id.* at 2–3.

Historically, and in conjunction with Florida law, those possessing an interest in real property would cause that interest, as reflected in a written document, to be recorded in the official records in the county where the real property was situated. *Id.* at 3. These written documents are generally commercial instruments such as mortgages and assignments of mortgages, and promissory notes. In spite of—or because of—this tradition, the Mortgage Bankers Association ("MBA") along with others "in the mortgage lending industry determined to sidestep and refuse to comply with the recording laws by physically recording interests in real property." *Id.* To that end, the MBA created MERS.

In the mid–1990s, "mortgage servicing companies sought to accumulate and trade ever-growing numbers of mortgage-servicing contracts, while others in the industry began purchasing large numbers of mortgages, packaging them into massive investment pools and selling interests in the pools to investors, a process commonly referred to as mortgage 'securitization.'" *Id.* "In order to aggregate loans into pools and mortgage-servicing rights into large portfolios, promissory notes and mortgages had to be assigned from a multitude of smaller mortgage lenders to large national banks and servicers." *Id.* This assignment of mortgage loans required certain costs, one of which was the payment of recording fees to the Florida Clerks of Circuit Courts who record and maintain the public records. *Id.*

To "streamline" the assignment of residential mortgages and mortgage-servicing

rights between lenders, servicers, and securitizers, MBA created MERS. *Id.* at 4. MERS allows these entities to avoid the physical recording requirements in the clerk's office while at the same time depriving the Florida Clerks of Circuit Courts "of the recording fees to which they are entitled and the public of its ability to identify the true mortgagee of mortgaged property." *Id.* at 4.

MERS accomplishes these goals by being listed as the "'mortgagee' on millions of loans throughout the nation." *Id.* This is despite the fact that "MERS does not originate any loans, lend any money, or own or hold any promissory notes." *Id.* The Complaint avers that MERS is "a straw man" in the public records which allows the true owner of the loan to remain anonymous. In addition, this designation of MERS in the public record permits the loan to change hands at will without notice to the public, without recording an assignment in the official records, and without paying the recording fees normally associated with an assignment. *Id.* According to Plaintiff, the "effort to disconnect the debt (the note) from the collateral (the mortgage) to save on recording costs is at the heart of the unlawful scheme that is MERS." *Id.* at 5.

Mortgage lenders, banks, and other financial institutions pay fees to become members of MERS. As MERS members, those institutions can electronically track the "transfers of mortgage and mortgage servicing rights." *Id.* "When a MERS member originated a mortgage loan, the loan is registered with MERS and assigned a Mortgage Identification Number. While the true lender is the obligee on the promissory note, MERS is listed as the 'mortgagee' on the mortgage." *Id.* Through this system, "MERS attempts to separate the promissory note evidencing the debt from the mortgage that is collat-

eral or security for the note. According to MERS, the lender takes possession of and holds the note, which may be subsequently assigned multiple times through multiple note owners," while MERS remains the "mortgagee" on the mortgage recorded in the official records. *Id.* "MERS and its members refer to such loans as 'MERS on Mortgage' or 'MOM' loans." *Id.*

Absent MERS, an "assignee of a mortgage would record the assignment in the public records (or risk losing its lien priority) each time a mortgage was assigned." *Id.* at 5. However with a MOM loan, it can be "assigned from the originator to another MERS member" without the necessity to record a change to the public records because "the purported 'mortgagee' has not changed." *Id.* Rather than a change to the public records, "a notation is made somewhere in MERS's private files which purportedly effectuates the transfer of the mortgage from one MERS member to another." *Id.* It is only when a MERS member transfers its "interest to a non-member or when a MERS member wishes to foreclose a mortgage" that an assignment is created and recorded in the court's public records. *Id.*

MERS, according to the Complaint, was created to avoid the need for paying public recording fees and it has worked effectively. "MERS estimates that it saves an average of $30 in assignment costs per loan. MERS also estimates that, assuming each loan on its system has been transferred only once, as of 2009 it 'saved' its members *$2.4 billion* in recording expenses." *Id.* (emphasis in original). This "savings" MERS boasts of would, in MERS' absence, "have been paid to the public officials responsible for maintaining the public records in each state," including Plaintiff and the other Florida Clerks of Circuit Courts. *Id.*

More than 65 million mortgages have been registered on MERS since 1997.

Previously, "a mortgage assignment would be recorded in the Official Records by the clerk of the circuit court having jurisdiction over the encumbered property and could be viewed by the public free of charge," whereas currently "MERS records mortgage assignments in its own private recording system to which only it and its paying members have access." *Id.* at 6.

Plaintiff alleges that MERS violates §§ 28.222(1) and (6), Florida Statutes which provide:

> (1) The clerk of the circuit court shall be the recorder of all instruments that he or she may be required or authorized by law to record in the county where he or she is clerk.

* * *

> (6) All instruments recorded in the Official Records shall always be open to the public, under the supervision of the clerk, for the purpose of inspection thereof and of making extracts therefrom; but the clerk shall not be required to perform any service in connection with such inspection or making of extracts without payment of service charges . . . .

It is Plaintiff's contention that the "Florida Legislature has never retreated from the public recording system required by Section 28.222, Florida Statutes, or approved the MERS private recording system, nor has any legislation ever passed to authorize MERS to usurp this public function." *Id.* at 7.

Plaintiff further maintains that § 28.24, Florida Statutes, authorizes the clerks to collect an additional service charge for the recording of mortgage assignments. *Id.* This charge is "deposited in the Public Records Modernization Trust Fund for use in updating and modernizing the public records system of [that clerk's] office. Because MERS members no longer record

interim assignments of mortgages, no additional service charge is received ... and there are fewer funds to help modernize the public system." *Id.*

A significant problem with MERS is that it is predicated on false and misleading statements, according to the Complaint. "For the MERS system to work as designed, MERS must falsely claim to be the 'mortgagee' on millions of mortgages recorded in the Official Records of the State of Florida. However, MERS is not a mortgagee." *Id.* "MERS does not lend any money or otherwise finance the purchase of any real property. Accordingly, MERS's claim ... that it is a 'mortgagee' is a falsehood, knowingly made for the purpose of promoting the use of the private MERS system and evading public recording fees." *Id.*

As to the class allegations, Plaintiff claims there are approximately sixty-seven class members; each "clerk of the circuit court for each Florida county in which a mortgage has been recorded on which MERS purports to be 'mortgagee.'" *Id.* at 8. Plaintiff alleges the class is numerous, that Plaintiff's claims are typical of the claims of the members of the class, that this action will resolve common questions of fact and law, and that Plaintiff will "vigorously represent the interest of the members of the class." *Id.* at 8–9.

The Complaint alleged six common law counts. Count I seeks a Writ of Quo Warranto based upon the allegations that MERS usurped the rights of the Florida Clerks of Circuit Courts and is improperly exercising their powers and functions. Count II seeks an injunction prohibiting MERS from exercising those rights and privileges that belong to the Florida Clerks of Circuit Courts and requiring MERS to "rectify the damage" it has caused. Count III, a claim for civil conspiracy, asserts that MERS and its members have perpetrated a scheme to avoid paying recording fees with the Florida Clerks of Circuit Courts. Count IV, a claim for unjust enrichment, alleges that MERS received a benefit from the Florida Clerks of Circuit Courts by virtue of its use of the public recording system, that MERS accepted that benefit by being listed in the official records, and that MERS' assignment of mortgages within its own system precludes the Florida Clerks of Circuit Courts from recording fees to which they are entitled. Count V, a claim for fraudulent misrepresentation, is premised on the allegation that MERS falsely recorded mortgages by listing itself as "mortgagee" when in fact it was not. Count VI, a claim for negligent misrepresentation, alleges that MERS recorded mortgages that listed MERS as the "mortgagee" when MERS should have known that this was a false statement, and that Plaintiff recorded those mortgages in reliance upon those false statements.

Originally filed in state court, MERS removed this action based on diversity of citizenship on November 18, 2011. Thereafter, MERS filed its Motion to Dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), asserting that Plaintiff lacks standing to bring this lawsuit and that the Complaint fails to state "any claim or legal theory upon which he is entitled to relief."

## III. STANDARD OF REVIEW

A straightforward Rule 12(b)(1) facial attack, such as the one in this case, on a court's jurisdiction is based solely on the allegations of the complaint. Under such an attack, this Court "must consider the allegations in the plaintiff's complaint as true" and from those allegations determine if the plaintiff has sufficiently alleged a basis for subject matter jurisdiction. *Lord Abbett Mun. Income Fund, Inc. v.*

*Tyson,* 671 F.3d 1203, 1206 (11th Cir.2012) (internal quotations removed).

Similarly, in deciding a Rule 12(b)(6) motion to dismiss, the district court is required to accept all allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Mills v. Foremost Ins. Co.,* 511 F.3d 1300, 1303 (11th Cir.2008) (quoting *Castro v. Sec'y of Homeland Sec.,* 472 F.3d 1334, 1336 (11th Cir.2006)). The Supreme Court explained in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007) that "heightened fact pleading of specifics" is not required, "but only enough facts to state a claim to relief that is plausible on its face." That said, the plausibility standard established in *Twombly* "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1965.

The Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) further explained the plausibility requirement, noting that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Determining plausibility will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense;" however, the pleadings will be inadequate if the court cannot "infer more than the mere possibility of misconduct." *Id.* at 1950. Therefore, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

Even so, "a plaintiff need not plead specific facts for every element of a cause of action." *Snow v. DirecTV, Inc.,* 450 F.3d 1314, 1320 (11th Cir.2006). However, "while notice pleading may not require that the pleader allege a 'specific fact' to cover every element or allege 'with

precision' each element of a claim, it is still necessary that a complaint 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" *Roe v. Aware Woman Ctr. For Choice, Inc.,* 253 F.3d 678, 683 (11th Cir. 2001) (quoting *In re Plywood Antitrust Litigation,* 655 F.2d 627, 641 (5th Cir. Unit A, 1981)). Therefore, "at a minimum, notice pleading requires that a complaint contain inferential allegations from which we can identify each of the material elements necessary to sustain a recovery under some viable legal theory." *Id.*

## IV. DISCUSSION

Defendant MERS' position is that this action should be dismissed with prejudice as it is entirely baseless and premised on frivolous legal theories. MERS' arguments for dismissal can be placed in two categories: standing and insufficient allegations. First, the Clerk lacks standing because § 28.222, Florida Statutes, does not create a private right of action and because the Clerk has suffered no injury within the meaning of the case or controversy requirement of Article III of the United States Constitution. Second, the Clerk is unable to plead facts meeting the requisite elements of each cause of action. This Court will address these arguments in turn.

### A. Standing

Defendant MERS' position is that Plaintiff lacks standing to bring this claim pursuant to § 28.222, Florida Statutes, since that statute does not create a cause of action. Section 28.222, Florida Statutes, merely outlines Plaintiff's duties and responsibilities for recording documents, and this statute was intended to protect bona fide purchasers or creditors—not Plaintiff.

■ "Article III of the United States Constitution limits the jurisdiction of the federal courts to actual cases and controversies." *Cone Corp. v. Fla. Dept. of Transp.*, 921 F.2d 1190, 1203 (11th Cir. 1991). "The standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir.2006) (internal quotation and citation removed). "It is not enough that 'the [plaintiff]'s complaint sets forth facts from which we could imagine an injury sufficient to satisfy Article III's standing requirements.'" *Id.* at 1206 (citing *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229 (11th Cir.2000) (citations omitted)). Federal courts " 'should not speculate concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none ....' " *Elend*, 471 F.3d at 1206 (quoting *Miccosukee Tribe of Indians of Fla.*, 226 F.3d at 1229–30).

■ To determine if standing exists, a federal court "must take into account 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Elend*, 471 F.3d at 1206 (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The prudential requirements for standing are that "a plaintiff cannot raise the claims of third parties; cannot claim standing based on a generalized grievance; and must raise a claim within the zone of interest covered by a statutory conferral of standing." *Id.* (citing *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203–10 (11th Cir.1991)). To establish constitutional standing, a plaintiff

must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Florida Wildlife Fed'n, Inc. v. South Florida Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir.2011). It is a plaintiff's burden to establish each of these standing elements. *Fla. ex rel. Attorney Gen. v. U.S. Dep't of Health & Human Serv.*, 648 F.3d 1235, 1243 (11th Cir.2011). In the event that a plaintiff no longer meets all of these requirements, "the case no longer presents a live case or controversy, and the federal court must dismiss the case for lack of subject matter jurisdiction." *Florida Wildlife Fed'n, Inc.*, 647 F.3d at 1302.

Plaintiff maintains that MERS contravenes §§ 28.222(1) and (6), Florida Statutes. Plaintiff alleges that the Florida Clerks of Circuit Courts are the sole official record keepers authorized by law and the MERS private recording system "unlawfully interferes and competes with the public recording system." (Dkt. 2, pg. 7). Plaintiff further alleges that MERS has deprived Plaintiff of "millions of dollars in recording fees" because each recording with MERS is a potential document not recorded with Plaintiff. *Id.* Plaintiff further maintains that the MERS system "falsely claim[s] to be the 'mortgagee' on millions of mortgages recorded in the Official Records of the State of Florida. However, MERS is not a mortgagee." *Id.* In essence, Plaintiff seeks damages based upon a theory of a deprivation of recording fees for documents that were not recorded with him.

■ Plaintiff has alleged an injury in fact—that the MERS recording system both usurps his lawful authority to maintain public land records and reduces the

amount of revenue his office receives. In addition, Plaintiff alleges that this "non-public recording" interferes with the integrity of the public records by misstating that MERS is the true mortgage holder and rendering the public unable to identify who has the true mortgage interest in the property. With these allegations, Plaintiff has satisfied Article III's standing requirements. But another obstacle stands in Plaintiff's path.

## B. Statutory Right

 This Court turns now to the pivotal question of whether § 28.222, Florida Statutes, provides Plaintiff with a right of action. In deciding this issue, this Court is guided by the Florida Supreme Court's directives. The Florida Supreme Court instructs that "[w]hether a violation of a statute can serve as the basis for a private cause of action is a question of legislative intent" and courts "must determine legislative intent from the plain meaning of the statute." *Aramark Unif. & Career Apparel, Inc. v. Easton*, 894 So.2d 20, 23 (Fla.2004). "A statute creates a new cause of action if it provides a remedy unavailable under the common law." 894 So.2d at 23 (citing *Fla. E. Coast Ry. Co. v. McRoberts*, 111 Fla. 278, 149 So. 631, 632 (1933)). "To discern legislative intent, we look 'primarily' to the actual language used in the statute." *Borden v. East–European Ins. Co.*, 921 So.2d 587, 595 (Fla.2006). "Further, '[w]hen the statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent.'" *Borden*, 921 So.2d at 595 (quoting *Daniels v. Fla. Dep't of Health*, 898 So.2d 61, 64 (Fla.2005)).

There appears to be no dispute between the parties that § 28.222, Florida Statutes, provides no right of action.[3] This lack of a right of action leads MERS to argue that Plaintiff lacks standing because § 28.222, Florida Statutes, provides no legally protected interest in the recording fees for security instruments, including mortgage assignments, that are never recorded.

 Plaintiff rejects this characterization of Defendant's argument. Instead, Plaintiff responds that the relief he seeks—Writ of Quo Warranto, civil conspiracy, unjust enrichment, and fraudulent and negligent misrepresentation—are common law claims that are independent of a statutory violation. Section 28.222, Florida Statutes, is simply the "statutory source of the Clerk's authority over the public records of Duval County; it provides the 'basis' of the Clerk's claims only in the sense that it sets forth the duties and privileges of the Clerk's Office." (Dkt. 24, pg. 3). Plaintiff maintains, essentially, that "the fact that Section 28.222 [Florida Statutes] may not explicitly create a cause of action is irrelevant." (Dkt. 16, pg. 4).

 Plaintiff's view of the case, however, is problematic. Simple reliance on a statutory provision does not provide a cause of action as a basis for common law claims. In Florida, common law claims cannot be based on violations of a statute where that statute itself does not create a private right of action. This Court believes the law is correctly stated in *Buell v. Direct Gen. Ins. Agency, Inc.*, 267 Fed. Appx. 907, 909 (11th Cir.2008) (noting that a statute which lacks a cause of action for its violation because it merely makes provision to secure the safety or welfare of

---

**3.** Even if a dispute existed, this Court would find no right of action can be discerned in § 28.222, Florida Statutes. The clear and unambiguous language of the statute simply outlines Plaintiff's authority to accept, main-

tain, and make available to the public certain records. The statute provides no remedy or positive enforcement mechanism that requires the filing of records with Plaintiff's office.

the public as an entity, does not establish civil liability on common law claims). *See Curtis v. City of West Palm Beach,* 82 So.3d 894 (Fla. 4th DCA 2011) (explaining that a plaintiff, seekings monetary damages based upon a statute that provides solely for injunctive relief, cannot create a cause of action for damages based upon that statute); *West Coast Life Ins. Co. v. Life Brokerage Partners LLC.,* No. 08-80897–CIV, 2009 WL 2957749, *12 (S.D.Fla. Sept. 9, 2009) (stating "Plaintiff's attempt to assert a 'conspiracy' to violate [Florida's Unfair Insurance Trade Practices Act] is unavailing because Plaintiff may not evade the Florida legislature's decision to withhold a statutory cause of action for violations of the pertinent provisions of FUITPA by asserting common law claims based on such violations."). Accordingly, common law claims may not be premised on a violation of a statute where that statute is devoid of a private right of action.

As § 28.222, Florida Statutes, provides no private remedy for its violation, Plaintiff may not bring common law claims premised upon the statute. Plaintiff may not use § 28.222, Florida Statutes, to provide a framework for the common law claims set forth in the Complaint. Plaintiff may only seek relief with the Florida Legislature. Absent a change in § 28.222, Florida Statutes, that provides a statutory mechanism for Plaintiff to recover unfiled assignment fees, Plaintiff cannot prevail on this claim as a matter of law.

## C. INDIVIDUAL COUNTS

Even if Plaintiff could establish that he has a right to bring this cause of action, each of his claims for relief would fail on the merits.

### 1. COUNT I—Writ of Quo Warranto

MERS argues that a Writ of Quo Warranto is inapplicable in this case. The writ, according to MERS, is employed to challenge the right of an individual to hold public office or to allege that a public officer exceeded the rights and privileges of office. Since MERS fits into neither category, the writ is inapplicable here.

Plaintiff responds that an action in quo warranto can lie where a private individual attempts to exercise some right or privilege which derives from the state. Plaintiff cites *Macnamara v. Kissimmee River Valley Sportsmans' Ass'n,* 648 So.2d 155 (Fla. 2d DCA 1994) and *Belle Island Inv. Co., Ltd. v. Feingold,* 453 So.2d 1143, 1146 (Fla. 3d DCA 1984) in support of this argument. Finally, Plaintiff contends that under the unique circumstances of this case, the Writ of Quo Warranto is the appropriate remedy.

"The term 'quo warranto' means 'by what authority.' This writ historically has been used to determine whether a state officer or agency has improperly exercised a power or right derived from the State." *Florida House of Representatives v. Crist,* 999 So.2d 601, 607 (Fla.2008), *cert denied,* 555 U.S. 1212, 129 S.Ct. 1526, 173 L.Ed.2d 657 (2009). This common law remedy "is employed either to determine the right of an individual to hold public office or to challenge a public officer's attempt to exercise some right or privilege derived from the State." *State ex rel. Bruce v. Kiesling,* 632 So.2d 601 (Fla.1994). "It is one of the fundamentals of procedure in quo warranto that the writ will not be issued where there is another ample and sufficient remedy provided by law for the relief sought." *State v. Duval Cnty.,* 105 Fla. 174, 175, 141 So. 173 (Fla.1932).

This Court concludes that Plaintiff seeks to impermissibly extend the scope of this writ. In *Macnamara v. Kissimmee River Valley Sportsmans' Ass'n,* 648 So.2d 155 (Fla. 2d DCA 1994), the court was confronted with a defendant who had fenced a

spoil island in a lake at the entrance of the Kissimmee River. The court concluded that the evidence demonstrated that defendant was attempting to exercise rights derived from the state to use state-owned property, and therefore a writ was issued. *Id.* at 165. Furthermore, in *Belle Island Inv. Co. v. Feingold,* 453 So.2d 1143, 1144 (Fla. 3d DCA 1984), the court was presented with the question of "whether quo warranto is appropriate to test a private foreign corporation's exercise of its corporate franchise." Once again, the writ was permitted because "[w]hile it [was] true that Belle Island exercise[d] no franchise or privilege granted by the State of Florida, it exists only by a grant of authority from St. Vincent and the Grenadines. Therefore, once we determined that it is appropriate, as a matter of comity, to recognize the law and judicial acts of St. Vincent, it follows logically that quo warranto should lie to test Belle Island's authority to act when the jurisdiction of incorporation has restricted that authority, as here." *Id.* at 1146. These cases appear to stand for the proposition that a Writ of Quo Warranto will lie when there is an allegation that a party was exercising either a right or privilege that can only be conferred by the government.

 That is not, however, Plaintiff's claim. Plaintiff alleges that MERS is attempting "to do that which is reserved for the sovereign." (Dkt. 16, pg. 8). MERS has attempted to usurp Plaintiff's function as recorder of all instruments pertaining to real property in that county by "setting up a competing recordation system for mortgage instrument in Duval County." *Id.* Since the law does not require payment of a recording fee when new assignments

are not recorded and since the public is not using the "MERS private recording system" to determine the true nature of incumbrances upon real estate, MERS is not usurping any government authority or power. Plaintiff cites no law to support his contention that a Writ of Quo Warranto will lie where a party attempts, but does not perform, a governmental function. Accordingly, the Writ of Quo Warranto will not lie.[4]

## 2. COUNT II—INJUNCTIVE RELIEF

 The Eleventh Circuit identified, in *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1097 (11th Cir.2004), "at least three different types of injunctions a federal court may issue." "The first is the traditional injunction, which may be issued as either an interim or permanent remedy for certain breaches of common law, statutory, or constitutional rights." *Id.* To obtain such an injunction a moving party must show:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Id.* "Of course, to obtain injunctive relief for violation of a statutory right, the statute in question must, at the very least, explicitly or implicitly create a cause of action. As this discussion demonstrates, a party may not obtain a 'traditional' injunction if he lacks a cognizable, meritorious claim." *Id.* at 1097 n. 5.

---

4. This Court makes this determination also with the understanding, as discussed *infra,* that MERS has no legal obligation to record documents with Plaintiff and that Plaintiff has no legal authority to reject a document that is properly presented to him for recording. As will be discussed later, it is a ministerial act and the clerk exercises no discretion but must record the document whether it be true or false.

■ "The second type of injunction a court may issue is a 'statutory injunction.' A statutory injunction is available where a statute bans certain conduct or establishes certain rights, then specifies that a court may grant an injunction to enforce the statute." *Id.* at 1098.

■ The third and final type of injunction is one issued under the All Writs Act. *Id.* at 1099. This injunction is available when a party can "point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior." *Id.* at 1100.

■ The only type of injunction possibly available to Plaintiff is the first or traditional injunction. However, even that is unavailable to him because he lacks a legal, cognizable, meritorious claim. *See Pierson v. Orlando Reg'l Healthcare Sys., Inc.,* 619 F.Supp.2d 1260, 1288 (M.D.Fla. 2009) (stating that an injunction "is not a cause of action but a remedy").

## 3. COUNT III—CIVIL CONSPIRACY

■ In Florida, a civil conspiracy requires: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Eagletech Comm., Inc. v. Bryn Mawr Inv. Grp., Inc.,* 79 So.3d 855, 863 (Fla. 4th DCA 2012) (internal quotations omitted). "General allegations of conspiracy are inadequate. A complaint must set forth clear, positive, and specific allegations of civil conspiracy." *Id.* (internal quotations and citations removed).

■ If the counts regarding the "goals of the conspiracy" are dismissed, "so too the conspiracy count must fail. The gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." *Palm Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc.,* 13 So.3d 1090, 1096 (Fla. 4th DCA 2009) (internal quotations and citations omitted). "An act which does not constitute a basis for an action against one person cannot be made the basis of a civil action for conspiracy." *Id.* (quoting *Buckner v. Lower Fla. Keys Hosp. Dist.,* 403 So.2d 1025, 1027 (Fla. 3d DCA 1981)).

■ The exception to this general rule is that "an alternative basis for a civil conspiracy claim exists where the plaintiff can show some 'peculiar power of coercion' possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess." *Walters v. Blankenship,* 931 So.2d 137, 140 (Fla. 5th DCA 2006).

■ Plaintiff's claims for civil conspiracy cannot stand on their own nor do they fit within the conspiracy exception. The Complaint alleges that MERS was established to avoid paying recording fees to the Florida Clerks of Circuit Courts. Over 5,000 members use MERS; they therefore collectively "control the vast majority of all residential and commercial loans and lending opportunities." (Dkt. 2, pg. 16). "MERS and its members have exercised their aggregate coercive powers to require borrowers to execute mortgages naming MERS as the 'mortgagee.' MERS and its members have further conspired and agreed to fail and refuse to record assignments of such mortgages between them." *Id.* Moreover, the Complaint alleges that "[i]n addition to avoiding the payment of recording fees to the Florida Clerks of Court, MERS and its members have caused fraudulent and misleading documents to be executed and recorded in the Official Records of Duval County and all other counties in Florida." *Id.* According to Plaintiff, the recording fees "which

would have been paid to the Florida Clerks of Court (but for the conspiracy) have been avoided and the accuracy of the public records eroded due to the MERS system." *Id.*

What is problematic about Plaintiff's claim is that MERS has not committed an unlawful act or a lawful act by unlawful means. First, this Court must be clear that the recording of mortgage assignments, under Florida law, is at the complete discretion of the party wishing to record the document. The parties concede there is no statute or judicial decision that *requires* the recording of mortgage assignments. Florida law does address, however, the effect against creditors of the failure to file an assignment of a mortgage against those creditors. Section 701.02(1), Florida Statutes provides that a mortgage assignment is not effective in providing constructive notice to creditors and subsequent purchasers unless it is recorded. Plaintiff also mentions that, pursuant to § 28.24, Florida Statutes, he is authorized to collect an additional service charge for the recording of mortgage assignments. Even so, there is no language in any Florida statute or judicial decision suggesting that the recording of a mortgage assignment is mandatory, nor does Plaintiff now allege that it is mandatory.

Consistent with the plain text of the statutes, the history and purpose of the recording statutes demonstrate that there was never an intent to *require* recording, but only an intent to create a mechanism to provide *notice* to subsequent bona fide purchasers or creditors of an encumbrance on real property. *C.f. Townsend v. Morton,* 36 So.3d 865, 869 (Fla. 5th DCA 2010) (stating "[t]he fact that a deed is unrecorded does not affect the efficacy or validity of the instrument as between the grantor and grantee or those with notice"); *Sweat v. Yates,* 463 So.2d 306, 307 (Fla. 1st DCA 1984) ("The recording statute has always

been primarily intended to protect the rights of bona fide purchasers of property and creditors of property owners, rather than the immediate parties to the conveyance."); *Tri–County Produce Dist. Inc. v. Northeast Prod. Credit Ass'n,* 160 So.2d 46, 51 (Fla. 1st DCA 1963) ("The record of an instrument is constructive notice to creditors and subsequent purchasers.").

 The consequence of failing to record a mortgage is that the mortgagee, creditor, lender, subsequent mortgagees, subsequent lender, or subsequent purchaser foregoes the protections or safe harbors provided by the statute against claims brought by subsequent purchasers or creditors of the real property. *JP Morgan Chase v. New Millennial, LC,* 6 So.3d 681, 685 (Fla. 2nd DCA 2009) (Observing that "if the original mortgagee assigns the mortgage to Entity A and Entity A fails to record that assignment, Entity A cannot claim priority over a latter assignee of the same mortgage (Entity B)."). *See also In re Halabi,* 184 F.3d 1335, 1338 (11th Cir. 1999) ("From the point of view of the mortgagor or someone standing in his shoes, a subsequent assignment of the mortgagee's interest—whether recorded or not—does not change the nature of the interest of the mortgagor or someone claiming under him. Nor should a failure to record any subsequent assignment afford the mortgagor or the trustee standing in his shoes an opportunity to avoid the mortgage.").

The parties argued this point during the hearing on MERS' pending motion. Plaintiff conceded there is no legal requirement that MERS record mortgages and pay a recording fee. Interestingly, Plaintiff's counsel argued:

And we're not suggesting a hundred percent of the assignments would in fact be recorded. But what we are suggesting is that, again ... for a couple of

hundred years of property law in this country, people did exactly that to protect themselves against what might happen in the event that the person from whom they took an assignment tried to either, A, file a recorded satisfaction, perhaps in error, or, B, that the mortgagor might attempt to go out and get and put on improperly—put on other debt or obligations that required mortgage. And so they protected themselves in the manner provided by law by filing the assignments of the mortgages.

We're not suggesting that it was done every single time, but we are suggesting this: We are suggesting that their system was not designed in any way to harm. We're not suggesting that there was a design element on their part to harm individual mortgagors. We're saying that their system was designed and set up to avoid what had been the practice up until that moment in time of recording these assignments. And, specifically, that assertion of their entitlement to do so is predicated on the false claim that they are the mortgagor.

(Dkt. 29, pg. 47).

Plaintiff's argument that condemning MERS' practice would benefit the general public does not create a cause of action. Accordingly, Plaintiff is attempting to recover in this lawsuit for actions that are neither required nor prohibited under the law. Accordingly, this count must be dismissed. *C.f. In re Ernie Haire Ford, Inc.*, 459 B.R. 824, 841 (M.D.Fla.2011) (concluding that there were no allegations of the use of any peculiar power of coercion to support a claim for civil conspiracy).

### 4. COUNT IV—UNJUST ENRICHMENT

■ "The elements of an unjust enrichment claim are a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Fla. Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1242 n. 4 (Fla.2004) (internal quotations omitted).

Plaintiff alleges that the following allegations are sufficient to establish a cause of action for unjust enrichment: "that it has conferred a benefit upon MERS by recording mortgages in which MERS claims to be the 'mortgagee;' " "(2) MERS has accepted and benefitted from such services, in that its designation as mortgagee allows it to operate its competing private system for which it receives fees from its members;" and "(3) Under the circumstances, it would be inequitable to permit MERS to retain the benefit without paying the full value thereof." (Dkt. 16, pg. 14).

■ The difficulties with these allegations are multiple. First, as discussed *supra*, MERS has no legal duty to file mortgage assignments with Plaintiff. Therefore, Plaintiff has not, and cannot, allege that he provided a benefit to MERS. *See Peoples Nat. Bank of Commerce v. First Union Nat'l Bank of Fla., N.A.*, 667 So.2d 876, 879 (Fla. 3d DCA 1996) (concluding the plaintiff "could not and did not allege that it had directly conferred a benefit on the defendants," and dismissal with prejudice was proper).

■ Second, Plaintiff cannot allege that MERS failed to pay the recording fee for any mortgage or assignment of mortgage that Plaintiff recorded. Third, and finally, Plaintiff has not conferred a benefit upon MERS by complying with his statutory obligations—recording a mortgage. Plaintiff's recording task is merely ministerial and Plaintiff is without discretion in the matter. Any benefit from recording a mortgage, as MERS points out, is derived from Florida law—*i.e.* priority of a lien—not from Plaintiff.

### 5. COUNTS V AND VI—FRAUDU-LENT MISREPRESENTATION AND NEGLIGENT MISREPRE-SENTATION

The four elements of fraudulent misrepresentation are: " '(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation.' " *Butler v. Yusem*, 44 So.3d 102, 105 (Fla.2010) (quoting *Johnson v. Davis*, 480 So.2d 625 (Fla.1985)). The four elements for negligent misrepresentation are:

(1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation.

*Baggett v. Electricians Local 915 Credit Union*, 620 So.2d 784, 786 (Fla. 2d DCA 1993).

The allegations in the Complaint are that MERS caused "mortgages to be recorded in the Official Records in Duval County (and in all other counties in Florida) which state that MERS is the 'mortgagee.' Such statements are false. MERS is not a mortgagee, as it lends no money and requires no interest in the promissory notes which are secured by the mortgages being recorded." (Dkt. 2, pg. 18). The false statement, according to Plaintiff, is that MERS is a "mortgagee," and this false statement is "made for the

purpose of inducing the Florida Clerks of Court, including the Duval County Clerk of Court to record such mortgages in reliance thereon." *Id.* The Complaint further asserts that Plaintiff recorded these mortgages in reliance upon these false statements, and the he has been damaged by the denial of recording fees which would have been paid but for MERS' misrepresentations. (Dkt. 2, pgs. 18–19). The gravamen of these counts is the allegation that MERS recorded false statements that it is the mortgagee. (Dkt. 2, pgs. 18, 19).

MERS maintains that this, as a matter of law, is a not a false statement. Instead, this is a legal designation in a contract and that designation has been affirmed by courts in Florida and by the Eleventh Circuit.

The central theme of Plaintiff's Complaint is the assertion that MERS is falsely designating itself as a mortgagee on mortgages filed and recorded with Plaintiff. MERS insists this is an incorrect legal conclusion.

In Florida, "an instrument given for the purpose or with the intention of securing the payment of money is a mortgage." *Marcus v. Hull*, 142 Fla. 306, 311, 195 So. 170 (Fla.1940). A mortgagee has "the right to foreclose and reforeclose its liens." *Zipperer v. City of Fort Myers*, 41 F.3d 619, 623 (11th Cir.1995). A mortgagee, therefore, "has a constitutionally protected property interest in his mortgage." *Id.*

A mortgage, however, "does not convey title or create any interest in real property." *Southern Colonial Mortg. Co., Inc. v. Medeiros*, 347 So.2d 736, 738 (Fla. 4th DCA 1977). "A mortgagor holds legal title to the mortgaged property while the mortgagee's interest is merely that of a lienor." *Hoffman v. Semet*, 316 So.2d 649, 651 (Fla. 4th DCA 1975).[5] In essence,

---

5. One Florida court explained the common law history of mortgages this way:

The strict common law view of the mortgage was as a conditional conveyance of land vesting legal title in the mortgagee.

a mortgage "involves two separate concepts. It is an executory contract or agreement in which one generally promises to allow a future sale of real property if a debt is not paid. It is also a specific lien on the property described in the mortgage." *Pitts v. Pastore,* 561 So.2d 297, 301 (Fla. 2d DCA 1990).

When addressing the question of whether MERS is the mortgagee, the Florida courts have consistently affirmed the use of MERS as the designated mortgagee of record and the principle that MERS may serve as the mortgagee or as nominee for the lender and the lender's successors and assigns. Two cases are particularly relevant on this point.

In *Mortgage Electronic Registration Systems, Inc. v. Azize,* 965 So.2d 151 (Fla. 2d DCA 2007), the court held that MERS was not required to have a beneficial interest in the note in order to have standing in a foreclosure proceeding. The *Azize* Court was presented with the question of whether MERS had standing to initiate a foreclosure action on a mortgage when MERS was listed at the nominee for the note. The trial court "determined that MERS was not a proper party to bring the action and dismissed the complaint with prejudice for failure to state a cause of action." *Id.* The trial court further determined that "because MERS was not the owner of the beneficial interest in the note, even if the lost note was reestablished and MERS proved that it was the owner and holder of the note, MERS could not properly bring the foreclosure action." *Id.* at 153.

In reversing the trial court, the District Court of Appeal noted that MERS' allegation that it was the "owner and holder of the note and mortgage" was not contested and if MERS could so prove it would have standing to continue with the action. *Id.* at 154. The District Court of Appeal also noted "that the trial court's conclusion that MERS further lacked standing because one corporation cannot serve as the agent for another corporation is incorrect." *Id.*

Faced with a "very similar procedural situation" to the one before the *Azize* Court, the Florida Third District Court of Appeal in *Mortgage Electronic Registration Systems, Inc. v. Revoredo,* 955 So.2d 33 (Fla. 3d DCA 2007) relied upon *Azize.* The *Revoredo* Court noted that the determination that MERS had standing to maintain a mortgage foreclosure action was "in accord with the clear majority of cases" that had considered the question. 955 So.2d at 34. The Court then continued, "[t]o the extent that courts have encountered difficulties with the question, and have even ruled to the contrary of our conclusion, the problem arises from the difficulty of attempting to shoehorn a modern innovative instrument of commerce into nomenclature and legal categories which stem essentially from the medieval English land law." *Id.*

One federal court has also persuasively addressed this issue. *Trent v. Mortgage Electronic Registration Systems, Inc.,* 618 F.Supp.2d 1356, 1363 (M.D.Fla.2007). In *Trent,* the Court determined that "[w]hile the lender remained the 'creditor' of the secured loan ... MERS obtained legal

---

Upon default, the mortgagor forfeited all right and interest in the property; the mortgagee could simply reenter and assume full ownership. In time the equity courts responded to this harsh result by granting the mortgagor the right to redeem his property upon satisfying the outstanding debt. This right was termed the mortgagor's "equity of redemption". The equity of redemption eventually came to be regarded as an actual estate in land, i.e., the mortgagor's estate or interest in the mortgaged property. *Hoffman v. Semet,* 316 So.2d 649, 651–52 (Fla. 4th DCA 1975) (internal citations and quotations omitted).

title to the note and the ability to foreclose." That decision was affirmed on appeal. *Trent v. Mortgage Electronic Registration Systems, Inc.*, 288 Fed.Appx. 571, 572 (11th Cir.2008) (stating that MERS had "the legal right to foreclose" because it was the mortgagee).

In addition to determining that MERS can be the mortgagee, courts have rejected the contention that MERS' service as the mortgagee of record is a falsehood. In *Taylor v. Deutsche Bank National Trust Co.*, 44 So.3d 618, 623 (Fla. 5th DCA 2010), the court held that a mortgage assignment "was not defective by reason of the fact that MERS lacked a beneficial ownership interest in the note at the time of the assignment."

In addition, Plaintiff is attempting to weave an improper legal fiction out of whole-cloth. Plaintiff's function of accepting and recording instruments is merely a ministerial act. *See First Am. Title Ins. Co. of St. Lucie Cnty., Inc. v. Dixon*, 603 So.2d 562, 565 (Fla. 4th DCA 1992) (a clerk "candidly conceded that the function is operational and ministerial"); *Ferlita v. State*, 380 So.2d 1118, 1119 (Fla. 2d DCA 1980) (stating that "[a] clerk acts in a purely ministerial capacity, and has no discretion to pass upon the sufficiency of documents presented for filing"); *Pan Am. World Airways v. Gregory*, 96 So.2d 669, 671 (Fla. 3d DCA 1957) (describing the clerk's duties, when acting as an officer of the court, as "ministerial and as such he does not exercise any discretion"). The Florida Office of the Attorney General stated this succinctly:

> Pursuant to s. 28.222(1), F.S., the clerk "shall be the recorder of all instruments that he may be required or authorized by law to record in the county where he is clerk."
>
> Section 28.222(3), F.S., provides that the clerk of the circuit court shall record certain enumerated documents upon payment of the service charge. The term "shall" in a statute has, according to its normal usage, a mandatory connotation. In addition, the courts of this state have generally stated that the clerk acts in a purely ministerial capacity and has no discretion to determine the sufficiency of the documents presented for filing.
>
> [The Office of the Attorney General] has stated that if an instrument is entitled to be recorded, it must be recorded by the clerk if properly executed and upon payment of the clerk's fee.

The Honorable T.J. "Jerry" Greeson, 1991 Fla. Op. Att'y. Gen. 56 (1991); *see also Re: Clerk of Court—Indexing—Taxation—Liens—Tax Liens—Recording*, 2010 Fla. Op. Att'y Gen. 01 (2010).

■ Thus, while a clerk may not accept a document that he is not authorized to do so, if he is so authorized he must accept the document. *See Re. Records–Social Security Number–Official Records–Clerk of Court–Counties*, 2005 Fla. Op. Att'y. Gen. 37 (2005).

■ Accordingly, even assuming, *arguendo*, that Plaintiff is correct that MERS' filings are false and deceptive, Plaintiff has no authority to reject these mortgages when they are properly presented to him. Plaintiff must accept them, even if he operates under the assumption that they contain false information. Therefore, despite the allegations to the contrary, Plaintiff cannot, as a matter of law, sustain these causes of action because he cannot demonstrate that he relied on the purported misrepresentations—an indispensable element for these claims—nor that Plaintiffs justifiably relied on the purported misrepresentations. Plaintiff cannot allege that he was somehow induced into entering these documents in the public record based upon a misunderstanding that MERS was the mortgagee.

Finally, Plaintiff maintains that "courts in various jurisdictions have criticized or rejected MERS's claim that it is a mortgagee." (Dkt. 16, pg. 12). In support of this assertion, Plaintiff cites to *In re Agard*, 444 B.R. 231, 254 (Bankr.E.D.N.Y. 2011) and *Landmark Nat. Bank v. Kesler*, 289 Kan. 528, 216 P.3d 158, 166 (2009). According to Plaintiff, this "split of authority" means that "it cannot be said that MERS's statement that it is a 'mortgagee' is not false as a matter of law." (Dkt. 16, pgs. 12–13).

It is interesting to note that during the pendency of this motion, *In re Agard* was vacated and the exact language relied upon by Plaintiff was vacated as an unconstitutional advisory opinion. *See Agard v. Select Portfolio Servicing, Inc.*, BR 8–10–77338 REG, 2012 WL 1043690 (E.D.N.Y. March 28, 2012). Plaintiff maintains that this vacatur is of no consequence as *In re Agard* was merely cited for persuasive authority. Regardless, such an argument is pointless as this Court is divining Florida law.

## V. CONCLUSION

The relief Plaintiff seeks is not available in this Court. Despite the popular misconception, an Article III court cannot resolve any and all disputes. The remedy that Plaintiff seeks can only be obtained by a change in the Florida Statutes. The Florida Legislature has not yet provided a statutory remedy for Plaintiff to recover fees for unfiled assignments. Until such a change, Plaintiff has no right to seek recovery from MERS for the nonpayment of recording fees. This case is resolved as a legal issue and not a factual one. So no matter what additional facts Plaintiff may allege in an Amended Complaint, he cannot change the end result. The case must be dismissed with prejudice on its merits.

Accordingly it is **ORDERED**:

1. Defendants' Motion to Dismiss (Dkt. 10) is **GRANTED** and this case is **DISMISSED with PREJUDICE**;

2. The Clerk shall enter Judgment in favor of Defendant and Plaintiff shall take nothing; and

3. This Clerk is directed to close this case.